May it please the Court. My name is Joel Mormon and I represent the Appellant and Defendant Indeck Power Equipment Company. The trial court incorrectly interpreted the contract in this case in at least two major respects. First, the trial court held that the Indeck rate sheet quote, Plaintiff's Exhibit 6, wasn't a part of the original master contract. The way the court put it was it did not modify it. Second, the trial court held that Equistar was free to ignore the contractual dispute resolution system contained in Section 8B of the contract, this is the master contract, Plaintiff's Exhibit 7, requiring Equistar to promptly quote, dispute any invoices. The Indeck rate sheet, that is, the rate sheet that's found at Plaintiff's Exhibit 6, is the key to the case because it provides language that governs exactly what should have been done in terms of determining whether or not Indeck owed labor charges. This rate sheet is found in the Indeck proposal dated November 16, 2015. And that proposal is an attachment to, and we say a part of, the actual master contract, Plaintiff's Exhibit 7. That rate sheet, which is a part of the proposal, says that the field services, that is the labor, will be charged by Indeck on a per diem basis. In addition, it says that Indeck services performed only on the basis of a bona fide purchase order for field service. But most importantly, under the heading support labor, it says all labor, and I emphasize the word all, including but not limited to standby labor, initial checkout, startup, and testing required to assist the field service consultant at any time, shall be supplied by the customer, that is Equistar, at no cost to Indeck. Once again, the term is all and including but not limited to in this portion of the rate sheet. But that doesn't say correcting their mistakes, does it? They are correcting what they claim to be mistakes. That is correct, Judge. But the rate sheet does not say except where you're correcting mistakes or provide for a, provide for some sort of a labor charge that is going to be made to Indeck. It says all, including but not limited to, and I would note that it lists a number of different things there, that are not going to be charged to Indeck. And so we have a provision there which allocates labor costs and says those labor costs are going to be Equistar's labor costs. And, of course, this is important because virtually all of Equistar's claimed damages consist of labor, and the contract assigns that cost, that labor cost, to Equistar. Thus, Equistar should bear these costs and not have a judgment against Indeck. The trial court, I think, recognized the centrality of this rate sheet issue because in the record on appeal 549, its order of findings of facts and conclusions of law, it says, Indeck asserts that the master contract was amended by the terms of a purchase order sent after the party signed the master contract. In fact, that's not what we contend at all. We didn't say it was amended by it. We say that the rate sheet of Equistar asserts that the purchase order did not modify the master contract. Once again, I think the Court is asking the wrong question. We didn't ask whether it modified the contract. It was a part of the contract. As set out more fully below, the Court finds and concludes that the purchase order did not modify or amend the master contract, once again, asking the wrong question. And again, on page 11 of the Plaintiff's Exhibit 33, which is an e-mail of March 2017, which has a different quote, and I believe that the court, the trial court was confused. They saw Plaintiff's Exhibit 33 as when this purchase order in the rate sheet was introduced, rather than understanding that it was an attachment to and a part of the master contract. Now, this issue was heavily litigated before a trial, as you can see, because the trial court made a mistake in the process in its order. It was a part of our motion for new trial, and it was specifically addressed and denied in the Court's order regarding the motion for new trial. The trial court mistake is that the rate sheet is a part of the master contract. It is not an amendment. It does not modify it. It is a part of the contract. And this is so because the contract that Article II provides, this contract, and that is a capital C defined term, which is found in the preamble, is expressly limited to the terms and conditions stated herein. Now, Equistar would like to say that when you use the language terms and conditions stated herein, that excludes this purchase order that was attached as a part of the contract. But Section 2A specifically defines this contract. Once again, with a capital C, it says it is said to consist of the contract documents, a defined term, issued under and incorporating the terms and conditions of this contract. So we have contract, contract documents, and then we define contract documents as defined in Section 1 of the definitions section as the contract and all documents attached hereto, including but not limited to exhibits, addenda, attachments, POs, and change orders. So what we have is the purchase order and the rated rate sheet in the quote attached to and a part of the contract, because it is a contract document. The court instead was trying to determine whether or not this purchase order, perhaps sent later, it seems to have thought that was the case, was going to modify the contract. But in fact, it doesn't modify the contract. It is a part of it. Well, let's say that's all right. We accept all that. I'm still not sure why this support labor provision covers damages. Well, I think what — That's ultimately your theory, right, is that they can't recover out-of-pocket damages because of this provision. That is correct, Judge. Why is that? There's no indication that this provision is meant to affect a breach scenario. Well, Judge, what I would say, and I certainly understand the question, because obviously we have damages, and in many cases you have a situation, as the court has obviously indicated. This is just an allocation of responsibilities at the outset. It doesn't tell us what happens when the parties breach. I understand where the court is coming from. I would respectfully disagree. I think that it is an allocation of labor. It says all labor. It doesn't say labor at the outset. But you'll agree normally if there's no language in a contract, we apply our sort of standard contract law damages. Don't contracts typically say limitation of damages, allocation? I mean, there's more language than this, right? Absolutely, Judge. I mean, in a situation where you don't have this language, we would say we would certainly agree with the court that you would allocate damages under one of the measures commonly used for damages, no question about it. Just an out-of-pocket case, I think. Out-of-pocket, cost of repair. There's any number of — You'll agree in the absence of this provision, we would affirm? Yes, Your Honor. The question is then, does this provision basically change the default? What is the effect of the provision, Judge? That is exactly right. And we would say, as I mentioned just a moment ago, that this allocates labor costs. And because it is so, in our view, extensive and absolute, all, including but not limited to, it says that the labor costs the parties negotiated for and intended that all labor costs would be borne by Equistar rather than INDEC in this particular situation. So labor — Do you know of any case that would use a provision like this? I'm sorry? Do you know of any case that would take a provision like this, that doesn't refer to damages at all, doesn't even have the word damages, and yet construes that as affecting our law of damages? I don't have a specific case that's on all fours with the facts of this case. I think that when you look at proper contract interpretation that — I don't have a case that says this, but I think when you look at proper contract interpretation that it would, in fact, say there's an allocation of the costs here. It says all, included but not limited to, speak specifically to labor. It enumerates some, which could be — some of those could have been — I will certainly concede, Judge — items that would have been up front, but not all. And so when you have that, it basically is saying that we have a division here. You're going to pay labor, I'm not going to pay labor in this particular situation. Let's say you contracted to paint my house white. I'm sorry, Judge? Let's say you contracted to paint my house white. Right. And I said I'll pay the labor costs, and you paint my house black. Right. And I say you've got to repaint it. Now, why would I have to pay the labor costs to fix that mistake? Under the general rule that Judge Hoeh mentioned just a second ago, you wouldn't. But if the contract had language like this, I would say that you would in that instance. It depends upon the contract language. Here it's all, included but not limited to. But, Judge, can you cite a single case in any jurisdiction that says — a contract that says you will bear the labor costs means that you bear all labor costs of repairing or fixing any mistakes that the other party caused? Judge, I don't have a specific case that's specific to that. I do not. Do you think that's a reasonable interpretation? I do, Judge, because it's so inclusive. When you look at the language there and when you look at it being a part of the master contract, which the — which I think the trial court incorrectly said it was not, then you've got a situation that's different from the ordinary case. This — the next major issue that was misinterpreted by the Court was that the Court interpreted the contract to not require Equistar to comply with the dispute resolution mechanism in Section 8B of the contract. 8B provides that if Equistar disputes an invoice amount, it has a binary choice, and that binary choice is that it may either withhold the disputed amount or it may, without waiver of its rights, seek reimbursement and then enter this dispute resolution process. Specifically, it says in the event of a dispute, the parties will promptly attempt to resolve the dispute, and upon resolution, Bayer will pay the portion of the disputed amount that the parties agree should be paid in that situation. We would argue that when you have a dispute and when you start a resolution process, you must require — it requires notice of some form or fashion. You can't have a dispute or you can't begin a dispute resolution process without that notice. This isn't done by telepathy, if you will. And when we look at this dispute resolution process, it uses the language, in the case of Equistar, that is predicated upon that notice provision there. Notice, as the contract provides in Article 24, is to be in writing, any and all notices. And in this situation, I think it's undisputed that Equistar never gave any written notice to us until October 18th of 2017, and that was done with one item, and then finally gave a more formal notice in December. Even with regard to it being a verbal controversy, what we have here, I think, is shop talk rather than notice of a dispute provision. And certainly there's no dispute but that they never disputed the invoices themselves. The failure to contest the invoices and provide prompt notice of the alleged defects, I believe, is fatal to Equistar's case. Equistar claims that its failure to comply with Section 8b should be excused because it's not a condition precedent. I believe that Equistar is wrong. When we look at the cases that we cite, which we believe are the most relevant cases, these cases state that there do not have to be magic words, which is what Equistar contends. They state that language such as if or provided that should be in the provision,  Equistar, however, agrees that the entire contract should be considered, and we certainly believe that's true. The cases say that. But Equistar then really only looks at this provision. The two key cases we discuss in which lay out these factors we're supposed to look at with regard to whether it is a condition precedent are Arbor Winster and Cajun Constructors. Both of them say look at the entire contract. Both of them say look at the substance, not magic words, not the if, and don't construe the provision in such a manner as to effectively void the provision, which is what I think Equistar ultimately does. Once again, keep in mind, no ambiguity was pleaded or argued at any point in time. In Arbor, the provision said even covenant and agree, and yet it still found that it was a condition precedent. And it said notice is not just a choice, it's a requirement. Similarly, here we have this binary option to dispute, therefore, to provide notice. Cajun said, once again, there's no magic words, no if, then language, but that was okay. And that provision, interestingly, used our same language promptly, that you have to promptly contest it. Remember that what we're talking about here is that it's the burden of Equistar to prove that they met conditions precedent, and I noted that in their complaint. Granted, I'm sure it was boilerplate language, but in their complaint, they specifically say that they met all conditions precedent. We say they didn't meet this condition precedent. Perhaps most importantly, the way that Equistar construes this provision renders this provision surplusage. Arbor says to construe it as a covenant in the Arbor case, not a condition precedent, would eviscerate the meaning of the provision, and that's exactly so here. What is the meaning of 8B if it imposes no obligation on Equistar? Equistar says this is merely a suggestion, and if so, we can ignore it completely. 8B is read out of the contract in that instant. Equistar obviously was displeased with ENDEC, but there was still no real notice here. There was no notice under that provision. There was no written notice under Article 24, and this is simply not enough. It does not excuse noncompliance, and therefore, we believe that this case should be reversed and rendered because of these errors in interpreting contract by the trial court. Thank you. Good morning, Your Honors. May it please the Court. Brett Solberg on behalf of Equistar Chemical, LP, the Ap-Le here and the plaintiff below. Your Honor, the judgment issued by Judge Rosenthal followed seven days of trial. Judge Rosenthal was very thorough, and we spent an awful lot of time talking about many of these issues below, and I'd like to start with Index's first issue, the interpretation of this idea of contract documents and the rate sheet somehow modifying the master agreement, which is Exhibit 7 below. I think they're saying it's not a modification, it's part of the contract. They're saying it's part of the— I don't know why this matters, but I think that is what they're saying. I think that's fair, Your Honor, and I think it doesn't matter because, as Your Honor correctly pointed out, it has no effect on the ultimate outcome. But just for good measure, the terms of the rate sheet set the scope of supply. They say what Equistar is buying from Index and what Index is selling to Equistar. They do not modify the terms of this contract. And that's found in 2A, where it says this contract is expressly limited to the terms and conditions stated herein, not in this contract and the contract documents, the contract addenda, and that's because contract documents is a defined term, and it means the contract, which is the document they're talking about here, Exhibit 7, and all documents attached here, too, shall be called contract documents. Well, the attachments are what Mr. Worm is talking about, the rate sheet. That doesn't modify, and you go back to 2A, where you see that it's expressly limited to the terms and conditions stated herein. So to the extent that there is a term or condition in the rate sheet that purports to modify the master agreement, it doesn't. But at the end of the day, the labor that was incurred, as Your Honors have correctly pointed out, is classic benefit of the bargain damage, classic out-of-pocket damages. And so whether or not Equistar agreed to pay for labor, support labor at the outset, is irrelevant when it's an element of damages, which it is here. So with respect to index second argument that Equistar had to supposedly dispute index invoices under Article 8, this, first of all, this was waived below. The first time that this argument was ever presented to the trial court was on a motion for new trial, and in the reply, index says, well, but the rule of waiver under the Fifth Circuit's precedent doesn't apply when the trial court addresses the merits of the argument. I agree with that. Trial court did not address the merits of the argument. The trial court's memorandum in order, denying the motion for new trial, says this should have been raised during trial. It wasn't, and I'm not hearing it. The trial court did not take time and address the actual merits. So I don't think this court has to address this argument at all because it was waived. Secondly, Article 8B has no notice provision whatsoever. The parties knew how to write a notice provision. Ten of the 27 articles in the master contract have explicit notice provisions. This article has none. Further, Equistar, or INDEC, rather, did not contest the court's underlying factual finding that Equistar timely provided information to INDEC and did not breach a duty to attempt a resolution. That's a finding found at record at 550. The court also made the finding, nor does the record reflect a failure on Equistar's part to provide information or documents to INDEC to attempt dispute resolution. In other words, Equistar, to the extent that it had to comply, did comply as a matter of fact, as a matter of uncontested fact because INDEC does not challenge those findings. Finally, Your Honor, this is not a condition precedent. Assuming that INDEC is right in its interpretation, assuming it had challenged the factual findings, there is no conditional language, there's no if, there's no provided that, there's no unconditioned that or some similar phrase, there's no conditional language that connects the condition precedent to the conditioned obligation. If there is any conditioned obligation, which there isn't. And the parties really knew how to do this because they did it in a bunch of other articles. One example is Article 13A, Roman 3B, which is a warranty provision, and it's one that we lost on in the trial court. The court found, as a matter of fact, that the boilers, big industrial boilers, vibrated themselves almost to oblivion, right? And they found that INDEC had actual knowledge of that because they had people on site watching these things shaking. But the court found that we were barred from recovering on that particular claim because we failed to give notice. That's because Article 13 requires specific notice at a specific time. Article 8A has no notice provision whatsoever. Now, there are two other issues that Mr. Moorman didn't have time to address, but with your permission, I'll spend a bit of the time I have left doing that. Issue number three has to do with this concept that Equistar usurped the relationship with INDEC subcontractor, Vega. Vega supplied what's called a water leveling or water measurement level system. It was a specific device that Equistar insisted on and insisted on buying from Vega that would detect the water level in the boiler. Too much water in the boiler is really bad. Too little water in the boiler is really bad. And Equistar asked for this particular system because of its need to integrate a higher safety level because it's a chemical plant, basically. So what happened was this thing didn't work. There's no dispute about that. And INDEC, the court found as a matter of fact, basically walked away. They got frustrated with trying to resolve the problem and walked away. So what Equistar did was they started working directly with Vega to repair the system, get it working, and indeed they did. Now what INDEC claims on appeal is that, and they claim below as well, is that Equistar should not be able to recover for the damages related to repairing the Vega system because they worked directly with Vega. This is to me a very puzzling argument. I mean, INDEC essentially claims that it has the right under the contract because it has a right to control its subcontractors, which it does. But once you have a breach and INDEC refuses to repair the breach, Equistar had every right under the law to exercise self-help. And I've seen no authority whatsoever, either from Mr. Moorman or in my own research, that suggests that anything to the contrary would be supported by law. And finally, the last issue is this rail car rental issue. So INDEC claims that the trial court had no evidence to support its decision, which awarded Equistar a month's worth of excess rail rental charges. What the rail rental charges were was basically this boiler was manufactured in Canada, was put on rail cars and brought to Illinois. The trial court found that the delivery of that was inefficient. And what the evidence supported was, was that basically it was sitting there ready to go, we'd already paid for it, and there were other bits of the contract left to be negotiated, pricing details, et cetera. And the president of the company wouldn't release the import paperwork and basically was holding it hostage. And it was held hostage for between five and six weeks is what the trial court found as a matter of fact, and the trial court specifically said that she discounted Ms. Forsyth, the president of INDEC's testimony on this issue and accepted the testimony of Equistar. And the idea was, or the complaint that INDEC has is that there was no basis for the trial court to decide what was an efficient amount of time to, or a reasonable amount of time to come from Canada to the United States. Well, we can figure that out pretty easily. We know that from the date it was loaded on the rail car to the date it arrived was two months. And we know that five to six weeks of that, it was being held up and not moving because Equistar failed, or sorry, INDEC failed to provide the paperwork necessary to bring it to the United States. Ergo three weeks is how long it took to actually get here. And the court awarded one month worth of excess rail charge costs. So, that is essentially a non-issue. Unless your honors have further questions for me, I'm happy to yield back to the court the balance of my time. Thank you, honors. We ask that the judgment be affirmed. The first issue of contract interpretation, which dealt with the rate sheet and its provision that all labor, including but not limited to some enumerated items, should be paid by INDEC. To that, opposing counsel indicated that we need to look at the benefit of the bargain. My response to that would be the benefit of the bargain is determined by the contract, what the contract says. Does the contract say X or does it say Y? You apply the contract and that's your benefit of the bargain. With regard to the Section 8B waiver argument, opposing counsel had indicated that this was something that was a completely new theory. A couple of things. The Ferrari case and a number of other cases that we cite specifically say that where it's raised on motion for new trial and where the court addresses it, that's something that is preserved for appeal. It is not waived at that point in time. And there's been no other cases that I have seen that have been cited by opposing counsel which would contradict that. The cases they had originally cited were dealing with the motion for new trial issue. That is not at the appellate level. And let me say that the court did address the merits in the order of this issue. And that notice, although in a slightly different form, was heavily litigated at the trial court. It was something that was specifically addressed by the court in its original memorandum and order. It was not something that was more than something where there is a lot of factual information about it, although this obviously is a legal interpretation. With regard to the condition precedent language, once again, opposing counsel focuses on this idea of key words, if or some other word like that. The cases we've cited indicate that there are no magic words that are going to make a determination of this issue. Instead, we look at what happens here. Do you have to raise a dispute about an invoice? And the answer is yes. You have a binary choice there in 8B. And if you raise that dispute, obviously you have to give notice of it in some form or fashion. It is simply a matter of logic. He says that section 13, which is a different provision and has a notice requirement, means that our provision, therefore, can't actually have any particular purpose, simply because there is another provision which provides for notice and provides that if you don't give that notice, you're not going to be able to move forward in a certain instance. And if the Court found that, in fact, that was the case there, it does not mean that our notice provision is invalid. In fact, if anything, I would argue that the Court finding that where you have a requirement of notice and where you have that notice requirement not met, they couldn't collect bolsters the idea that 8B should be enforced here. Let me briefly address the Vega situation, which is a situation that was raised by opposing counsel. Sort of at the top of the boilers sits a water level measure to make sure that they don't have too little water or too much water, which obviously can cause significant problems in these big boilers which are running at very, very high pressures. There is a provision, section 16, the independent contractor provision, which specifically says, in part, buyers shall have no direction or control of seller or its employees, agents and subcontractors, except in the results to be obtained. It says no direction or control. It doesn't say that it has to be complete control or anything else. Think of the process in this. They ignored ENDEC at that point in time. So we said okay, and I will certainly concede that they were our subcontractor at that point in time. But when there were problems, what happened? In our view, the buyer here, that is Equistar, moved us out of the way and dealt directly with ENDEC. Now, remember what the language of section 16 is, no direction or control. The Court found under RLA 570 that there was some control exercised by Equistar here. Similarly, they also found that they worked with them, which violated this specific section. And the effect of this was that we were not able to, on our own terms, with our own subcontractor, and perhaps backcharging them, take care of this problem. Instead, that was something that was between Equistar and the subcontractor here. As such, Equistar took on the risk and the resolution of the Vegas sensor issues. We have three theories there that usurped agency, prevented performance, or estoppel. Any one of these, we believe, requires reversal. Thank you.